UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ALVIN MAZIE                                                                              PLAINTIFF

V.                                                              CIVIL ACTION NO. 3:20-CV-395-DPJ-FKB

PHH MORTGAGE CORPORATION f/k/a/                                          DEFENDANTS
CEDANT MORTGAGE CORPORATION and
PHH MORTGAGE SERVICES
CORPORATION, as Agents for U.S. Bank
National Association, as Trustee, successor in
interest to Bank of America National Association,
as Trustee, successor by merger to LaSalle Bank
National Association, as Trustee for Structured
Asset Investment Loan Trust Mortgage

ORDER

Plaintiff Alvin Mazie says Defendants PHH Mortgage Corporation and PHH Mortgage

Services Corporation (collectively PHH) committed multiple torts when reporting to credit

bureaus and agencies that Mazie missed mortgage payments and when initiating foreclosure on

Mazie's loan.  PHH moved for summary judgment on Mazie's claims [28], but the case was

stayed so the parties could explore settlement.  Order [37].  Those negotiations proved unfruitful,

so this Order lifts the stay and grants PHH's Motion for Summary Judgment [28] in part.  The

motion is otherwise denied.

I.       Background

On June 23 and 24, 2004, Mazie bought a house in Copiah County, Mississippi.  Mazie

Aff. [32] ¶ 4.  Mazie borrowed $66,750.00 for the purchase from Finance America, LLC, and

secured the loan through a deed of trust.  *Id.* ¶¶ 5–8.  Ocwen Loan Servicing, LLC, was the

original loan servicer but was later replaced by PHH.  Handville Aff. [28-1] ¶¶ 1, 3.

Before Mazie paid off the loan, his home was destroyed in a February 2, 2019 fire. Mazie Aff. [32] ¶ 12.  Hoping to apply his insurance proceeds from USAA to the debt, Mazie contacted Ocwen to request the total payoff amount.  *Id.* ¶¶ 14–15.  Ocwen responded in writing (the "Payoff Quote"), stating that the payoff amount was $36,381.99 (including interest and unpaid late charges) and informing Mazie that the quote was valid only through March 8, 2019. Payoff Quote [32-4] at 1–2.  The Payoff Quote also stated that, "**Payoff funds should be sent in one of the forms of certified funds listed here** . . . . **Funds not remitted in one of these forms will be returned**."  *Id.* at 1.  It further explained that "if the escrow funds are insufficient to pay the account in full, we will return the funds and continue to accrue interest on the loan."  *Id.* at 4.

Mazie says he then obtained a check for the payoff amount from USAA "during the later part of February, 2019."  Mazie Aff. [32] ¶ 20.  That same day, he and his wife endorsed the check and mailed it to Ocwen.  *Id.* ¶ 21.  Nothing in the record firmly indicates the exact date Mazie mailed the check or when Ocwen received it.  As discussed in greater detail in the analysis sections of this Order, the parties dispute whether the check arrived before March 8, 2019, the date Ocwen told Mazie the quote would expire.  They further dispute whether Mazie followed the instruction to send certified funds and whether he was required to provide a payoff affidavit allowing Ocwen to pay off the loan.  Despite those differences, it seems clear Ocwen endorsed the check and deposited the funds but did not credit the account.

On April 1, 2019, PHH replaced Ocwen as the loan servicer.  Handville Decl. [28-1] ¶¶ 1, 9.  Mazie first heard from PHH on April 18, 2019, when he received a monthly mortgage statement.  The letter stated that the new payoff amount (good through May 17, 2019) was $36,529.27; the new sum included interest, fees, and charges accrued after the March 8, 2019 payoff date.  State Ct. R. [1-2] at 30 (April 18, 2019 Letter).  Mazie next heard from PHH on

April 23, 2019, in a letter acknowledging Mazie's desire to pay off the loan with the insurance

proceeds.  Handville Decl. [28-1] at 80 (Attach. 7, April 23, 2019 Letter).  The letter stated—for

the first time—that PHH required an "executed payoff affidavit" and included the new (higher)

payoff amount good through May 17, 2019.  *Id.*

      Believing he no longer owed PHH anything, Mazie made no further payments and

refused to return the requested affidavit.  So, on July 1, 2019, PHH reported to the national and

state credit bureaus that Mazie was in arrears in his mortgage payments, interest payments, late

fee payments, and inspection fees.  Mazie Decl. [32] ¶ 39.

      Mazie attempted to clear things up with PHH during calls that occurred from April

through July 2019.  *Id.* ¶¶ 42–44.  PHH apparently researched the dispute during this period and

wrote Mazie on June 10, 2019, that his loan was still outstanding.  Handville Decl. [28-1] at 85

(Attach. 8, June 10, 2019 Letter).  Contrary to its current position, PHH's letter did not assert that

the funds were received after March 8, 2019 (i.e., that they were late), and instead stated:  "Our

records show that on April 23, 2019, a letter was sent to your attention requesting the Payoff

Affidavit to be executed and returned to the address mentioned in the letter."  *Id.*

      When PHH continued its collection efforts, Mazie retained counsel, and his attorney

wrote PHH on July 1, 2019, stating that the loan was paid in full; he also attached a copy of the

endorsed check.  July 1, 2019 Letter [32-9] at 1–3.  Nevertheless, PHH continued to report the

full debt.  Mazie says the false reporting interfered with his efforts to make certain purchases.

Pl.'s Resps. to Interrogs. [28-2] at 5.

      PHH also began foreclosure proceedings on Mazie's property by hiring Shapiro &

Brown, LLC.  Mazie Decl. [32] ¶ 62.  Acting as PHH's agent, the firm proceeded with

foreclosure, publishing a foreclosure notice in the Copiah County Courier on October 30, 2019; the notice stated Mazie defaulted his mortgage.  Foreclosure Notice [32-11].

PHH reversed that decision in November 2019 and accepted the insurance proceeds as a discounted payoff of the loan and cancelled the Deed of Trust; no foreclosure occurred. Handville Decl. [28-1] ¶ 18.  Still, Mazie says PHH continued to report the full debt to credit reporting agencies through March 2020.  *See* Mazie Decl. [34] ¶¶ 68–71.  But PHH has produced competent record evidence that it submitted an amendment to Mazie's credit reporting to reflect that the loan was paid off in November 2019.  Handville Decl. [28-1] ¶ 19 (citing *id.* at 101 (Attach. 12, Am. Report) (reflecting "Current Balance" of "$0")).

Distressed by PHH's reports and Shapiro & Brown's foreclosure notice, Mazie sued PHH on April 28, 2020.  Compl. [1-1].  He brought several claims against PHH including:  (1) fraudulent misrepresentation; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) negligence; (5) gross negligence; (6) negligent misrepresentation; and (7) defamation.  He seeks $500,000 in compensatory damages and $5 million in punitive damages.  *Id.* ¶¶ 97–106.  PHH now moves for summary judgment on Mazie's claims.  Defs.' Mot. [28].  The motion has been fully briefed; the Court finds that both subject-matter and personal jurisdiction exist.

II.     Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which

that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant." *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v. Cotton*, 572 U.S. 650, 660 (2014). But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37 F.3d at 1075.

III.   Analysis

A.   Fraudulent and Negligent Misrepresentation

In Counts I and VI of his Complaint, Mazie asserts claims for fraudulent and negligent misrepresentation. The only representation he addresses in his summary-judgment response is an alleged statement from an unidentified Ocwen employee telling Mazie—before the March 8,

2019 initial deadline to pay—that his insurance-proceeds check had arrived.  Pl.'s Mem. [34] at

6–7, 12–13; Mazie Decl. [32] ¶¶ 21–26.  Because this is the only claim Mazie addresses in his

response, he has abandoned any other misrepresentation theories, including those PHH addressed

in its motion.  *See Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459

(5th Cir. 2022) ("A plaintiff abandons claims when it fails to address the claims or oppose a

motion challenging those claims.").

As for the alleged misrepresentation by the unidentified Ocwen employee, PHH correctly

argues in reply that this is a new theory Mazie never pleaded in his Complaint.  Defs.' Reply [35]

at 3–4.  Moreover, Mazie failed to disclose the factual basis for the new theory in response to a

pertinent interrogatory.  *Id.*; *see also* Pl.'s Resps. to Interrogs. [28-2] at 3.

The Fifth Circuit recently acknowledged that it has "taken two different approaches"

when "new claims [are] raised for the first time in response to a motion for summary judgment."

*Douglas v. Wells Fargo Bank, N.A.*, 992 F.3d 367, 373 (5th Cir. 2021).  "The first approach

states that a claim which is not raised in the complaint but, rather, is raised only in response to a

motion for summary judgment is not properly before the court."  *Id.* (citation and quotation

marks omitted).  "This rule is rooted in the need to provide adequate notice."  *Williams v. BFI*

*Waste Servs., LLC*, No. 3:16-CV-75-DPJ-FKB, 2017 WL 1498230, at *2 (S.D. Miss. Apr. 24,

2017).  The rule also applies to "new factual allegations and theories of liability not present in

the pleadings."  *De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 F. App'x 200, 204 (5th

Cir. 2012); *see Williams*, 2017 WL 1498230, at *2 (collecting published and unpublished

opinions reaching same result).  "The second approach instructs the district court to treat a new

claim raised in response to a motion for summary judgment as a request for leave to amend.  The

district court must then determine whether leave should be granted." *Douglas*, 992 F.3d at 373

(footnotes omitted).[1]

Here, Mazie's summary-judgment response presents both a new legal theory and a new

factual basis for it.  He does not allege any phone conversation with Ocwen related to his

insurance-proceeds check in his Complaint, nor does he mention the conversation when PHH

directly asked Mazie in its interrogatories to list each conversation with an Ocwen agent.

Compl. [1-1]; Pl.'s Resps. to Interrogs. [28-2] at 2–3.

Under the Fifth Circuit's most restrictive approach, the new claims are waived.  But even

assuming the Court should construe Mazie's summary-judgment memorandum as a motion to

amend, it would not allow amendment.  To begin, doing so violates several local procedural

rules.  Uniform Local Rule 7(b) requires all prayers for relief to be "by a motion in the form

prescribed by this Rule."  Rule 7(b)(2) requires a supporting memorandum of law.  Rule

7(b)(3)(C) prohibits imbedding a motion in the body of a response, and Rule 15 requires the

party seeking leave to amend to attach a proposed amended pleading.  Aside from all that, PHH

---

[1] The second approach may have yet another variation.  In *Pierce v. Hearne Independent School District*, the Fifth Circuit observed that "[g]enerally[ ] a new *claim* or *legal theory* raised in response to a dispositive motion *should* be construed as a request for leave to amend the complaint, and the district court should determine whether leave should be granted."  600 F. App'x 194, 200 (5th Cir. 2015) (emphasis added).  "*New factual allegations,* however, need not be so construed unless the plaintiff explicitly requests leave to amend and expresses the grounds upon which the amendment is sought with particularity."  *Id*. n.6 (citing *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003)).  *Pierce* is unpublished and, despite its broad language, may have been intended for the Rule 12(b)(6) context.  Regardless, another Fifth Circuit panel seemed to read *Pierce* as extending to summary-judgment responses and rejected the holding in a published opinion.  *Jackson v. Gautreaux*, 3 F.4th 182, 189 (5th Cir. 2021) (stating that it is "unclear how cases like *Pierce* are consistent with our rule of orderliness and our numerous published precedents holding litigants forfeit arguments raised for the first time at summary judgment" and further noting that such relief is normally reserved for pro se plaintiffs).

had the right to rely on Mazie's complaint and sworn interrogatory responses, especially when Mazie never sought leave to amend either.

Finally, the deadline to seek leave to amend the complaint expired on September 14, 2020. *See* CMO [7]. Yet Mazie first raised this new theory (and these new claims) on May 28, 2021. Given this timing, Federal Rule of Civil Procedure 6(b)(1)(B) required Mazie to show "good cause" and "excusable neglect." Mazie addressed none of the factors that would allow the Court to assess whether the inferred out-of-time motion for leave to amend (which was never actually filed) should be allowed. Accordingly, the Court will not consider Mazie's response as a motion to amend and grants PHH's summary-judgment motion on Mazie's negligent and fraudulent misrepresentation claims.

B.     Intentional Infliction of Emotional Distress

Next, Mazie says PHH's decision to initiate foreclosure amounted to intentional infliction of emotional distress (IIED). Compl. [1-1] ¶ 98. Such a claim requires demonstrating

> that (1) the defendant acted willfully or wantonly toward the plaintiff by committing certain described actions; (2) the defendant's acts are ones that evoke outrage or revulsion in civilized society; (3) the acts were directed at, or intended to cause harm to, the plaintiff; (4) the plaintiff suffered severe emotional distress as a direct result of the acts of the defendant; and (5) such resulting emotional distress was foreseeable from the intentional acts of the defendant.

*Jones v. City of Hattiesburg*, 228 So. 3d 816, 819 (Miss. Ct. App. 2017) (quoting *Rainer v. Wal-Mart Assocs. Inc.*, 119 So. 3d 398, 403–04 (Miss. Ct. App. 2013)).

"Mississippi Courts have repeatedly recognized [that], 'meeting the requisites of a claim for [IIED] is a tall order in Mississippi.'" *Frascogna v. Wells Fargo Bank N.A.*, No. 3:07-CV-96-DPJ-JCS, 2009 WL 2843284, at *8 (S.D. Miss. Aug. 31, 2009) (quoting *Riley v. F.A. Richard & Assocs., Inc.*, 16 So. 3d 708, 719 (Miss. Ct. App. 2009)). "[T]he conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

8

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."
*Bowden v. Young*, 120 So. 3d 971, 980 (Miss. 2013) (quoting *Pegues v. Emerson Elec. Co.*, 913
F. Supp. 976, 982 (N.D. Miss. 1996)).  "[I]t is the nature of the act itself—as opposed to the
seriousness of the consequences—which gives impetus to legal redress."  *Sears, Roebuck & Co.
v. Devers*, 405 So. 2d 898, 902 (Miss. 1981), *overruled on other grounds by Adams v. U.S.
Homecrafters, Inc.*, 744 So. 2d 736 (Miss. 1999).

Mazie says he meets this high standard because PHH acted "intentionally, fraudulently,
or in bad faith . . . to injure or harm [his] reputation, credit rating, or character" when it initiated
foreclosure on his property.  Pl.'s Mem. [34] at 13.  To support that otherwise conclusory
argument, Mazie relies solely on *National Mortgage Company v. Williams*.  357 So. 2d 934
(Miss. 1978).  But *Williams* never addressed an IIED claim; it found a fact question on punitive
damages where the mortgagor *completed* foreclosure and sold the borrower's property even
though the borrow was found not to be in default and had protested the sale.  *Id.* at 935–36
(recognizing that punitive damages can be awarded for wrongful foreclosure).  Notwithstanding
the different standards that apply to IIED and punitive-damages claims, the case is factually inapt
since PHH canceled the foreclosure the month after it was initiated.

Mazie has not identified sufficiently egregious conduct related to the foreclosure to create
a material dispute, and the foreclosure is the only factual basis he offered for the IIED claim.  *See
Montgomery v. CitiMortgage, Inc.*, 955 F. Supp. 2d 640, 653 (S.D. Miss. 2013) (finding
mortgagor did not act maliciously in referring loan to foreclosure after allegedly mismanaging
payments and interest reductions); *see also Stewart v. GMAC Mortg., LLC*, No. 2:10-CV-149-
DCB-JMR, 2011 WL 1296887, at *10 (S.D. Miss. Mar. 31, 2011) (explaining "frustrating"
conduct and mismanagement in foreclosure was not outrageous).  PHH's foreclosure therefore

does not reach the high bar necessary to establish an IIED claim.  Accordingly, summary judgment is granted on this claim.

C.       Negligent Infliction of Emotional Distress

Mazie also brings a negligent-infliction-of-emotional-distress (NIED) claim based on PHH's decision to initiate foreclosure.  Compl. [1-1] ¶ 99.  Unlike an IIED claim, "[i]n order to recover emotional distress damages resulting from ordinary negligence, [a plaintiff] must prove 'some sort of physical manifestation of injury or demonstrable harm, whether it be physical or mental, and that harm must have been reasonably [foreseeable] to the defendant.'"  *Randolph v. Lambert*, 926 So. 2d 941, 946 (Miss. Ct. App. 2006) (quoting *Am. Bankers' Ins. Co. of Fla. v. Wells*, 819 So. 2d 1196, 1208 (Miss. 2001)); *cf. Collins v. City of Newton*, 240 So. 3d 1211, 1221 (Miss. 2018).

Mazie acknowledges this rule but states that it does not apply when the defendant's conduct "evokes outrage or revulsion."  Pl.'s Mem. [34] at 14 (quoting *Gamble v. Dollar Gen. Corp.*, 852 So. 2d 5, 11 (Miss. 2003)).  That is true for IIED, but not NIED.  *Am. Bankers' Ins. Co.*, 819 So. 2d at 1208–09.  The Court therefore grants PHH's motion for summary judgment as to the NIED claim.[2]

D.       Claims Related to Credit Reporting

Mazie brought no claims under the Fair Credit Reporting Act (FCRA), but he did pursue three state-law claims related to PHH's credit reporting:  (1) negligence; (2) gross negligence;

---

[2] Mazie's argument on the NIED claim suggests that he has abandoned it.  But PHH is also correct that Mazie has not offered sufficient evidence to establish the requisite harm.  *See* Defs.' Mem. [29] at 12–13.  Mazie never addresses this point, and he does not attempt to argue that the mostly stress-related injuries he described in his supporting declaration suffice.  *See, e.g.*, Mazie Decl. [32] ¶ 54.  Nor could he.  *See Am. Bankers' Ins. Co.*, 819 So. 2d at 1209 (finding testimony similar to Mazie's declaration insufficient).

and (3) defamation.  PHH says FCRA preempts those claims.  Defs.' Mem. [29] at 13–14 (citing

15 U.S.C. §§ 1681h(e), 1681t(b)(1)(F)).  Although Mazie raises negligence and defamation

causes of action in other contexts, the Court pauses here to consider whether FRCA preempts

Mazie's credit-reporting-related claims.

FCRA includes two preemption provisions:  15 U.S.C. §§ 1681h(e) and 1681t(b)(1)(F).

Section 1681h(e) was enacted first and states in relevant part:

> [N]o consumer may bring any action or proceeding in the nature of defamation
> . . . or negligence with respect to the reporting of information against . . . any
> person who furnishes information to a consumer reporting agency . . . except as to
> false information furnished with malice or willful intent to injure such consumer.

Section 1681t(b)(1)(F) was added later—without deleting § 1681h(e)—and it states, "No

requirement or prohibition may be imposed under the laws of any State (1) with respect to any

subject matter regulated under . . . (F) section 1681s-2 of this title, relating to the responsibilities

of persons who furnish information to consumer reporting agencies."

There is no national consensus regarding these "potentially contradictory" provisions.

*Rivera v. Countrywide Fin. Corp.*, No. 1:04-CV-103, 2006 WL 2431391, at *3 (S.D. Miss. Aug.

21, 2006); *see also McCloud v. Homeside Lending*, 309 F. Supp. 2d 1335, 1340–41 (N.D. Ala.

2004) (collecting cases and noting four competing constructions of the statutes).  Though the

Fifth Circuit has yet to directly address which provision should apply to common-law state

claims, it has expressly relied on § 1681h(e) to hold that "FCRA preempts state[-]law defamation

or negligent reporting claims unless the plaintiff consumer proves 'malice or willful intent to

injure' him."  *Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 638 (5th Cir. 2002)

(quoting 15 U.S.C. § 1681(h)(e)); *see also Morris v. Equifax Info. Servs., LLC*, 457 F.3d 460,

471 (5th Cir. 2006) (affirming summary judgment where plaintiff failed to demonstrate malice).

District courts in this circuit, including this one, have followed *Young* and found that § 1681h(e) preempts state-law claims "in the nature of defamation . . . or negligence" that do not involve malice or willful intent.  15 U.S.C. § 1681h(e); *see Rivera*, 2006 WL 2431391, at *3 (following *Young* as controlling in preempting state-law defamation and negligence reporting claims); *Taylor v. Chase Auto Fin. Corp.*, 850 F. Supp. 2d 637, 642 (N.D. Miss. 2012) (same); *Meisel v. USA Shade & Fabric Structures Inc.*, 795 F. Supp. 2d 481, 487 & n.2 (N.D. Tex. 2011) (finding § 1681h(e) preempts only state-law torts that do not allege malice or willful intent to injure); *James v. MRC Receivables Corp.*, No. 16-0448, 2018 WL 3213147, at *9 (W.D. La. June 28, 2018) (same).

Mazie says this standard should not apply because "federal district[ ] courts have held that the FCRA does not pre-empt a plaintiff's purely state law claims when a plaintiff only asserts state law claims."  Pl.'s Mem. [34] at 16 (citing *King v. Retailers Nat'l Bank*, 388 F. Supp. 2d 913 (N.D. Ill. 2005); *Anderson v. Nissan Motor Acceptance Corp.*, 326 F. Supp. 2d 760 (S.D. Miss. 2003)).

First and foremost, the statutory text does not embrace Mazie's argument.  Section 1681h(e) preempts "*any* action . . . in the nature of defamation  . . . or negligence" unless the consumer proves "malice or willful intent to injure." (emphasis added).  It is not limited to cases where no FCRA claims are asserted.  Nor do Mazie's cited cases support his argument.  *King* and *Anderson* both address motions to remand under the complete-preemption doctrine, which states that "[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).  Neither *King* nor *Anderson* address whether FCRA preemption is limited to cases pursuing

12

FCRA and common-law claims.  *See King*, 388 F. Supp. 2d at 915–17 (holding that FCRA does not satisfy complete-preemption doctrine); *Anderson*, 326 F. Supp. 2d at 765 (holding the same for ECOA).  Mazie offers no other authority for this argument.[3]

Turning to Mazie's claims under the *Young* standard, Mazie cannot overcome FCRA preemption on his simple-negligence claim because, "[b]y its very nature, negligence does not imply conduct undertaken with malice or willful intent to injure."  *Wilborn v. Equifax, Inc.*, No. 1:18-CV-371, 2019 WL 507495, at *2 (S.D. Miss. Feb. 8, 2019).  Nor may his gross-negligence claim proceed.  Gross negligence is generally defined as "that course of conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them."  *McDonald v. Lemon-Mohler Ins. Agency, LLC*, 183 So. 3d 118, 126 (Miss. Ct. App. 2015) (quoting *Dame v. Estes*, 101 So. 2d 644, 645 (Miss. 1958)).  That standard is lower than malice or willful intent.  *See Walters v. Tenant Background Search*, No. 1:16-CV-1092-DAE, 2019 WL 4980450, at *5 (W.D. Tex. Aug. 1, 2019) (applying § 1681h(e) to gross-negligence claims).  Mazie's simple-negligence and gross-negligence claims are preempted; summary judgment is therefore granted as to those claims.

But Mazie's credit-reporting defamation claims are not necessarily preempted.  Under *Young*, Mazie can avoid the preemption bar by demonstrating PHH acted with malice or willful intent.  Mazie argues that PHH published defamatory information to credit-reporting agencies with malice.  Pl.'s Mem. [34] at 16.  If Mazie can prove PHH acted maliciously when it reported to the agencies, then the claim will not be preempted.  The Court will therefore turn to the merits of the defamation claims.

---

[3] If § 1681t(b)(1)(F) applies, then all state-law claims related to credit reporting are preempted.

E.       Defamation

Mazie brings two defamation claims.  The first relates to PHH's report to credit bureaus and agencies, and the second targets Shapiro & Brown's foreclosure notice published in the Copiah County Courier.  Compl. [1-1] ¶¶ 48–52, 63–64.  In Mississippi, to state a defamation claim, a plaintiff must "prove the following elements: (1) a false and defamatory statement concerning plaintiff; (2) [an] unprivileged publication to [a] third party; (3) fault amounting at least to negligence on [the] part of [the] publisher; (4) and either actionability of [the] statement irrespective of special harm or [the] existence of special harm caused by [the] publication." *Short v. Versiga*, 283 So. 3d 182, 185 (Miss. 2019) (quoting *Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998)) (alterations in original).[4]

Both defamation claims begin with a dispute over the validity of the debt—i.e., whether the reports were false.  According to PHH, the credit reports and the notice of foreclosure were not false for three reasons:  (1) Ocwen did not receive the endorsed check from USAA before March 8, 2019; (2) Mazie failed to send certified funds; and (3) Mazie refused to provide an executed payoff affidavit.  These issues now require a deeper dive into the alleged facts.

Ocwen's Payoff Quote stated that it was valid through March 8, 2019.  Payoff Quote [32-4 at 1].  As noted above, Mazie does not know when he sent the check to Ocwen, but he claims in his eleventh-hour declaration that Ocwen confirmed receipt before March 8.  If that statement can be considered, it alone creates questions of fact whether the check arrived on time and the

---

[4] Unlike the *mens rea* element for a negligence claim, a defamation claim can be established if fault amounts "at least to negligence," *Franklin*, 722 So. 2d at 692, and may be established if the statements were made with malice or willfulness, *see Rivera*, 2006 WL 2431391, at *4.  As noted, to overcome preemption as to the reporting claim, Mazie must show PHH's acts were malicious or willful.  15 U.S.C. § 1681h(e).

14

debt was paid off.  But the Court need not rely on that statement because a material dispute

otherwise exists.[5]

For starters, PHH has offered evidence to support its position that the check was late.

Notably, a declaration from Howard Handville (Senior Loan Analyst for PHH's parent

corporation) states that Ocwen did not receive the check until March 28, 2019.  Handville Decl.

[28-1] ¶ 8.  He backs that with Ocwen's customer logs referencing that same date.  *Id.* at 67

(Attach. 4, Customer Log).  PHH also notes that the cancelled check reflects a stamp reading

"March 28, 2019."  Check [32-5] at 1.

Looking first at the customer logs, the entries for March 29, 2019, include the following

notations:

- PAYMENT RECEIVED FROM OUTSOURCE FILE FOR $36,381.99. . . .

- INSURANCE CLAIM CHECK - RECEIVED: 3/29/19 01:04:39 LOSS DRAFT CHECK RCVD (3/28/2019; 12:37:35 PM) . . . FROM (USAA) . . . ISSUED ON (02/19/2019) . . . . INSURANCE CLAIM CHECK – PREVIOUSLY REFERENCED INS. CLAIM CHECK PROCESSED AS FOLLOWS: ; REVIEWED CLAIM CHECK IAO $36381.99 SENDING FOR DEPOSIT.

- WILL NEED TO COMPLETE PAYOFF AFFIDAVIT (SIGNED AND NOTARIZED) AND RETURN TO US FOR US TO PROCESS TOTAL PAYOFF OF THE LOAN . . . .

- HAZARD LOSS FUNDS TO BE DEPOSITED IN HAZARD SUSP. 3/29/19 13.22.52 FORWARD CHECK #0024493644 . . . .

Handville Decl. [28-1] at 67 (Attach. 4, Customer Logs).  As for the USAA check, it reveals the

following markings on its front:

---

[5] Though Mazie provides a superficial review of the evidence, he says enough to spot the issues. And while it was not the Court's intent to do either party's work, having read the record, the Court will not ignore it.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").



Check [32-5] at 1 (highlights added).  The back appears as follows:



*Id.*

As PHH states, the check is stamped "March 28, 2019." *Id.*  While this could be a receipt date, the customer logs suggest the check went through more than one set of hands, and we do not know at what point in the process the stamp was affixed or by whom.  Regardless, the bigger question is whether the account was paid off.  And if the check was rejected because it was late, as PHH now argues, then why didn't Ocwen's customer logs on March 28 and 29 say so?  Plus,

someone noted on the face of the instrument:  "PAID IN FULL."  *Id.*  The notation appeared in close proximity to another hand-written note, "#40223265," Mazie's loan number.  *Id.*; *see also* Payoff Quote [32-4] at 1 (listing loan number).  If Ocwen cannot accept a late check, this notation alone creates a question of fact whether the check was late and, more importantly, whether the loan was paid off.

Turning to the back of the check, Ocwen stamped:  "For Deposit Only Ocwen Financial Corporation Endorsement guaranteed for all Endorsements."  Check [32-5] at 1.  So too, the electronic endorsements indicate the check was returned to "WELLS FARGO BK NA" on March 29, 2019.  *Id.*  The customer logs likewise indicate that the funds were deposited.  *See* Handville Decl. [28-1] at 67 (Attach. 4, Customer Logs).  PHH has not explained why it would deposit the check if it was delinquent, and its other records indicate that it would not.  Assuming the check arrived after March 8, it would no longer cover the full debt.  And the Payoff Quote stated, "[I]f the escrow funds are insufficient to pay the account in full, *we will return the funds* and continue to accrue interest on the loan."  Payoff Quote [32-4] at 4 (emphasis added).  So, there is a question of fact whether the check was delinquent.

Turning to the method of payment, PHH says the funds were not certified as the payoff quote required.  *See* Defs.' Mem. [29] at 9; Payoff Quote [32-4] at 1–2.  Maybe so, but the Payoff Quote also stated, "**Funds not remitted in one of these forms will be returned** . . . ." Payoff Quote [32-4] at 1.  Again, Ocwen did not return the funds; it deposited them.  This creates questions of fact whether the payment method was a material term and whether Ocwen waived it.

PHH also complains that the check was not accompanied by an executed payoff affidavit or other express written correspondence that would allow Ocwen to apply the check to Mazie's

remaining balance.  Handville Decl. [28-1] ¶ 8.  It seems that this is where the dispute arose.

Ocwen noted the need for the affidavit in the customer logs on March 29, 2019, which might

explain why it held the deposited funds instead of applying them.  *Id.* at 67 (Attach. 4, Customer

Logs).  But, as Mazie argues, the loan documents do not mention the need for an executed

affidavit, and neither did the instructions Ocwen gave Mazie in the initial Payoff Quote.  *See*

Deed of Trust [32-3] at 4; Payoff Quote [32-4] at 4.

There may be perfectly reasonable explanations for all this, but, viewing the facts in the

light most favorable to Mazie—as the Court must under Rule 56—a question of fact exists

whether Mazie paid off the loan.

The parties also dispute whether Mazie has created a material dispute over the third

defamation element, "fault amounting at least to negligence."  *Short*, 283 So. 3d at 185.  Here,

the Court must differentiate between the defamation claim related to the notice of forfeiture and

the claim related to the credit reporting.  The notice of forfeiture faces no FCRA preemption

issues, but the defamation claim related to credit-reporting will be preempted unless Mazie

shows malice or willful intent to cause injury.

Ocwen deposited the check, and there is at least a question whether it marked the

instrument "PAID IN FULL" next to Mazie's loan number.  Check [32-5] at 1.  While PHH did

investigate early on, its June 10, 2019 letter to Mazie did not appear to acknowledge that PHH

considered the basis of Mazie's concerns.  Handville Decl. [28-1] at 85 (Attach. 8, June 10, 2019

Letter).  Nor did the letter mention PHH's current argument that the check was late.  *Id.*  Instead,

PHH noted that it had not received the payoff affidavit attached to its April 23, 2019 letter.  *Id.*

But again, neither the Deed of Trust nor the February 2019 Payoff Quote mentioned that

requirement, and the April 23 letter—sent after the check was received under the original

instructions—related to a higher payoff quote.  If the check was insufficient by the time it was received, the Payoff Quote says it should have been returned.  Instead, PHH held the insurance check for months while reporting that Mazie still owed the full amount.

On July 1, 2019, Mazie's attorney began writing PHH and attached the cancelled check, noting that it said:  "PAID IN FULL."  July 1, 2019 Letter [32-9] at 2.  But there is no suggestion PHH did anything after that to investigate the problem.  *See* Handville Decl. [28-1] ¶¶ 13–16. Instead, it sent Mazie another letter, 24 days later, acknowledging his desire to pay off the loan with the insurance proceeds and stating, "If you have not sent in the Insurance claim check(s), please endorse the claim check(s) and send it to us with the executed payoff affidavit." Handville Decl. [28-1] at 91 (Attach. 9, July 25, 2019 Letter).  Of course, by then PHH already had the cancelled check marked "PAID IN FULL."  There is a jury question whether it acted negligently.

Whether the credit-reporting claim survives FCRA preemption is a far closer question. Mazie attempts to overcome §1681h(e) by suggesting that the credit reports were maliciously made.  Pl.'s Mem. [34] at 16.  "[A] statement made with malice is an allegedly defamatory statement which the speaker either knows is false or in which the speaker acts in reckless disregard of its truth or falsity."  *Rivera*, 2006 WL 2431391, at *4 (citing *Cousin v. Trans Union Corp.*, 246 F.3d 359, 375 (5th Cir. 2001)).  Mazie must "present 'sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts* as to the truth of his publication.'"  *Morris*, 457 F.3d at 471 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

While the Court questions whether Mazie has met this standard, "[f]ederal preemption is an affirmative defense that a defendant must plead and prove."  *Fisher v. Halliburton*, 667 F.3d

19

602, 609 (5th Cir. 2012) (citing *Met. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) (other

citations omitted)).  And since PHH possessed the letter from counsel and a copy of the

cancelled check showing "PAID IN FULL," there is circumstantial evidence that PHH harbored

doubt as to whether it should be reporting that Mazie still owed the full amount of the loan and

was in default.  Regardless, "even if the standards of Rule 56 are met, a court has discretion to

deny a motion for summary judgment if it believes that 'a better course would be to proceed to a

full trial.'"  *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) (per curiam) (quoting *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986)).

The only other issue as to the defamation claims is whether Mazie has shown "special

harm."  *Speed v. Scott*, 787 So. 2d 626, 631 (Miss. 2001).  Under Mississippi law, a plaintiff

must show either that the statements were "actionable per se" or that Mazie suffered "special

harm."  *Id.* at 632.  Mazie does not contend that the statements were actionable per se.

> Special harm is the loss of something having economic or pecuniary value . . . .
> The limitation [that arose centuries ago] has persisted in the requirement that
> special harm, to serve as the foundation of an action for slander that is not
> actionable *per se*, must be 'temporal,' 'material,' pecuniary or economic in
> character.

*Id.* (quoting Restatement of Torts (Second) § 575 cmt. b. (Am. L. Inst. 1977)).  Neither party

delves deeply into this issue, but Mazie does say the statements damaged his credit, preventing

him from obtaining a loan.  Absent more information, the Court concludes that the claim should

go forward, but this may be an issue to watch at trial.

F.     Negligence and Gross Negligence

Mazie's credit-reporting-based negligence and gross-negligence claims are preempted by

FCRA.  But he offers one other theory—PHH's decision to foreclose on his property was both

negligent and grossly negligent.

20

The elements of ordinary negligence "are well-established:  duty or standard of care, breach of that duty or standard, proximate causation, and damages or injury."  *Porter v. Grand Casino of Miss. Inc.*, 181 So. 3d 980, 985 (Miss. 2016).  Viewing the facts in a light most favorable to Mazie, he raises a fact issue whether PHH breached its duty to act reasonably in executing foreclosure.

Mazie contends that, before the foreclosure notice, he told PHH that he paid the loan in full and his attorney wrote PHH twice to explain the situation while attaching the relevant documents.  Mazie Decl. [32] ¶¶ 42–44; Rhodes Letter [32-9]; Rhodes Letter [32-10].  While PHH says it responded to Mazie's inquiries in a June 10, 2019 letter, that letter summarized PHH's findings as to the second payoff statement PHH sent, not the initial statement from which this controversy arose.  *See* Handville Decl. [28-1] at 85 (Attach. 8, June 10, 2019 Letter).

Because Mazie presented evidence that PHH knew there was a discrepancy in receiving and applying Mazie's insurance-proceeds check, there is a question of fact whether PHH acted reasonably in continuing with foreclosure and therefore whether it breached its duty to act reasonably in its dealings with Mazie.  *See, e.g.*, *Montgomery*, 955 F. Supp. 2d at 650 (finding fact issue on plaintiff's negligence claim where mortgagor claimed plaintiffs did not submit paperwork, but plaintiff claimed mortgagor misguided them in process).  PHH's summary-judgment motion is therefore denied on this claim.

Moving to Mazie's gross-negligence claim, Mazie says PHH's decision to initiate foreclosure amounts to gross negligence because PHH disregarded Mazie's rights to an extent that amounted to "willfulness."  Pl.'s Resp. [34] at 14–15.  As noted, gross negligence is "that course of conduct which, under the particular circumstances, discloses a reckless indifference to

21

consequences without the exertion of any substantial effort to avoid them." *McDonald*, 183 So. 3d at 126 (quoting *Dame*, 101 So. 2d at 645).

Here, Mazie has not pointed to any evidence that shows PHH acted with reckless indifference in initiating foreclosure.  PHH investigated some of Mazie's phone calls, even if not all of them, and demonstrated some consideration for consequences in contacting Mazie regarding his delinquent payments.  Handville Decl. [28-1] at 85 (Attach. 8, June 10, 2019 Letter); *id.* at 67 (Attach. 4, Customer Logs).  And, as previously noted, PHH's records indicated that the loan was not paid off.  PHH's conduct shows some effort to avoid foreclosure and therefore cannot amount to reckless indifference.  PHH's motion for summary judgment is granted as to Mazie's gross-negligence claim.

IV.     Conclusion

The Court has considered all arguments, and those not addressed would not have changed the outcome.  For the reasons stated, Defendants' Motion for Summary Judgment [28] is granted as to Mazie's claims of fraudulent and negligent misrepresentation, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence based on PHH's credit reporting, and gross negligence.  The Motion is denied as to Mazie's negligence claim based on foreclosure and his defamation claims.  The stay is hereby lifted, and the parties are instructed to contact the Courtroom Deputy by September 28, 2022, to set this case for a pretrial conference and trial.

**SO ORDERED AND ADJUDGED** this the 21st day of September, 2022.

*s/ Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE